UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CASE NO. 3:17CV258

**Charles Mandizha**

        Plaintiff,

Vs.

1. **Bank of America Corporation**
2. **Teksystems**

        Defendants.

## JURISDICTION

This action is brought pursuant to Title VII of the Civil Rights Act of 1964 as amended, for employment discrimination. Jurisdiction is specifically conferred on this Court by 42 U.S.C. Section 2000e(5). Equitable and other relief are also sought under 42 U.S.C. 2000e(5)(g). Jurisdiction is also based on 28 U.S.C. Sections 1331, 1343 and 42 U.S.C. Sections 1981 et seq. Where employment discrimination based upon age is alleged, jurisdiction is conferred by 28 U.S.C. Sections 626(c)(1) and 626(e) and appropriate relief is also sought.

1

# PARTIES

1. Name of Plaintiff: Charles Mandizha
   Address: 15638 King Louis Court
   Charlotte, NC 28277

2. Name of first Defendant: Bank of America Corporation (BAC)
   Address: 100 N. Tryon St.
   Charlotte, NC 28255

3. Name of second Defendant: Teksystems
   Address: 7301 Parkway Dr.
   Hanover, MD 21076

# NATURE OF CASE

1. The address at which Plaintiff was employed by the defendant(s) is:

   901 W. Trade Street
   Charlotte NC, 28202

2. The discriminatory acts occurred on or about April 6, 2016.

3. Plaintiff filed charges with the Equal Employment Opportunity Commission regarding the defendant's discriminatory conduct on or about August 8, 2016

4. The Equal Employment Opportunity Commission sent the attached "Notice of Right to Sue" which I received on February, 6, 2017.

5. The discriminatory acts that are the basis of this suit are:
   a) Failure to employ Plaintiff
   b) Termination of Plaintiff's employment
   c) Denied equal pay/work
   d) Retaliation
   e) General harassment
   f) Segregation and classification of employees

6. Defendants' conducts are discriminatory with respect to Plaintiff's race.

7. Yes, Plaintiff believes that the defendants are still committing these acts against him.

2

# Common Facts to all Counts

### Personal and Professional Background

8. Plaintiff Mandizha is a 46 years old African American man who lives at 15638 King Louis Court, Charlotte, NC 28277 with his wife and their two boys aged 7 and 16 years old. Plaintiff is the primary breadwinner in the family.

9. Mandizha has worked in Information Technology (IT) for 20 years. He holds Bachelor of Business Studies and Computer Science and Master of Business Administration (MBA) degrees as well as an IT Infrastructure Library (ITIL) certificate.

10. Plaintiff worked for Alliance One International's Zimbabwean subsidiary as a Network Administrator for 3 years from 1998. In April 2001, he was transferred from his home country to the parent company's IT Operations Center in Farmville NC. He resided in Greenville NC. In the fall of 2003, Plaintiff enrolled in the MBA program at East Carolina University. He graduated in December 2006 and hoped to climb up the ladder to executive leadership positions in corporate America and realize the American dream.

11. In September 2005, Mandizha accepted a Server Engineer III role with BB&T at its IT Operations Center in Wilson NC. He was laid off in March 2015, after about 10 years with the company. Mandizha' role by then was Server Engineer IV. He had the Assistant Vice President bank title.

12. On 12/1/15, Mandizha received a fulltime job offer from State Farm. It included relocation assistance to Atlanta GA as well as assistance with selling and buying a house.

13. Mandizha was contacted by Meghan Higgins, a recruiter from Teksystems at the end of November 2016 about a Solution Architect contract job at Bank of America. The bank's hiring manager John Carson interviewed and offered Mandizha a contract for 18 months on 12/2/15.

14. Plaintiff discussed with Higgins and her Account Manager, Matt Dimeo about the fulltime State Farm job offer and his concerns with a contract job. Dimeo assured him that Teksystems would be able to help him find another job when his contract ended. Both Carson and Dimeo told Mandizha that there was a strong possibility of Plaintiff a fulltime bank employee within a few months. The two confirmed that Carson had started as a contract employee through Teksystems and became fulltime in less than a year. Mandizha then turned down the full time job offer from State Farm and accepted the Bank of America offer. He moved to Charlotte NC, where he started work on 1/4/16 at the Bank of America offices located at 901 W. Trade St.

15. Mandizha worked on the System of Record (SOR) program and was assigned to the SOR - Application (AIT) project. Plaintiff reliably understood that the SOR program was in its third attempt after the previous two had not been successful. BAC had to meet a 6/30/16 deadline to meet federal compliancy with the National Institute of Standards and Technology (NIST) regulations.

16. During orientation, Plaintiff was introduced to BAC's corporate policy including equal employment opportunity, diversity and inclusion as well as the promise of "an environment free from discrimination, retaliation and harassment".

3

# CAUSE OF ACTION

17.  Mandizha allege that the defendants have discriminated against him and that the following facts form the basis for his allegations:

## Count 1
## (Discrimination on the basis of race)

18.  **Discrimination by Reckmeyer:** Towards the end of January, Reckmeyer informed Plaintiff by email that he was the project manager for the AIT project and that Plaintiff had been assigned to it as the solution architect. Plaintiff emailed Reckmeyer telling him he would like to stop by his office and introduce himself. Reckmeyer did not respond to the email.

Reckmeyer and his Technical Delivery Manager (TDM) each held a weekly project meeting. While the TDM invited Plaintiff to his weekly meeting, Reckmeyer did not. Instead, Reckmeyer invited Robert Thornton whom apparently he preferred to have as the architect for the project. Thornton and Plaintiff were peers even though Thornton was also designated as team lead for the purposes of assigning projects and dealing with escalations. Both Reckmeyer and Thornton were white.

Plaintiff attended meetings hosted by TDM while Thornton attended those hosted by Reckmeyer. This unusual arrangement denied Mandizha access to information discussed in Reckmeyer's meetings which had the potential to adversely affect Mandizha's effectiveness on the project.

Plaintiff's manager Carson was included on Reckmeyer's weekly meeting invitations, and was also copied on follow up email conversations about the project. He was aware of the fact that Reckmeyer was engaging Thornton as his architect in place of Plaintiff. But Carson did not address the issue.

On a conference call meeting hosted by the TDM in mid-March, Reckmeyer stated that IT leadership wanted to have the data center field stored in AIT. Plaintiff knew that the said information resided in Remedy as part of server record and not in AIT as part of the application record. Mandizha informed the meeting accordingly. After the meeting, Reckmeyer communicated with IT leadership and then sent another email restating the leadership's initial position. Plaintiff responded repeating what he had said earlier in the meeting. Reckmeyer then sent an Instant Message to Plaintiff, asking Mandizha to call him. Reckmeyer told Plaintiff to desist from correcting information that was coming from the leadership in the presence of the client since it would make the "leadership" look bad.

Deb Borland, a client, agreed with Plaintiff's position and responded to the email conversation stating that her team did not expect to keep the data center details in AIT. Reckmeyer then accepted that position. Related emails can be found in my mailbox personal folders." Deb was white. Reckmeyer's actions were influenced by his racial bias against the African American Plaintiff.

On 4/6/16 a special AIT meeting with the client was called for 10:30 AM. Reckmeyer introduced Thornton as the solution architect and Mandizha as the engineer for AIT. In terms of hierarchy engineer is below architect. Thornton spoke as if he was the architect. When Mandizha tried to contribute to the discussion, Reckmeyer interrupted him and sent him an Instant Message immediately that read *"leave this amongst us to discuss please, thank you"*. See exhibit 2. Plaintiff did not speak for the remainder of the meeting.

Reckmeyer continued to show his racial bias, preferring a white architect over Mandizha who is black. Reckmeyer looked down upon Mandizha because of his race. Plaintiff was deeply affected by

4

Reckmeyer's discriminatory behavior. He cancelled his 12 PM Toastmaster speech and scheduled a meeting with Antoine Lindsay to share his experience and seek advice/help. Lindsay, an African American Bank of America employee, was a solution architect team lead. Mandizha relayed to Lindsay what had just transpired and expressed his deep concern with racial discrimination issues at the bank. Lindsay did not offer any suggestion.

At 2:06 PM, Plaintiff emailed Reckmeyer and copied Carson and Chris Krieger (Plaintiff's managers) the message: *"What was your concern with me speaking up on this call today? This has happened on several occasions before. Any information that could help me determine when I could speak up in a project meeting in the future would be greatly appreciated."*

Around 4:30 PM, Matt Dimeo and Alex Pappas (Teksystems employees) visited Mandizha at his cubicle. Dimeo told Mandizha that his contract had been terminated with immediate effect by Carson because of was "something" Plaintiff was alleged to have done that afternoon. Dimeo also stated that his request for Plaintiff to be allowed to serve two weeks of notice period had been denied by Carson.

Dimeo told Plaintiff that a Teksystems recruiter would contact him soon to help with finding another job. He also promised to provide Plaintiff with further details as he received them from Carson. After taking away Plaintiff's laptop and office keys, Dimeo walked Plaintiff out of the BAC building.

According to the position statement sent to EEOC by BAC, Reckmeyer and Carson communicated between 2:06PM and 4:30PM. Carson's decision to terminate Mandizha's contract was directly influenced by Reckmeyer. Reckmeyer's actions were motivated by race. Not only did Reckmeyer racially discriminate against Plaintiff, he also had significant influence in the termination of Plaintiff's contract as a retaliatory act.

Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation. Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, and other employment benefits.

19. **Discrimination by Carson:** Plaintiff was one of seven male contract solution architects working for Carson. The racial makeup was 1 Indian, 3 blacks and 3 whites. Two of the whites were assigned team lead roles. The third one (Bill Wilder) was assigned to work with Alan White, a bank manager who was in charge of the SOR-SACM program. So Bill got involved in key project planning activities including meetings with IT leadership and clients. Though the numbers showed diversity, reality revealed a non-inclusive environment in violation of bank's diversity and inclusion policy. The whites gained access to knowledge and information that minorities did not. They gained exposure and interacted with IT leadership. Their chances of getting recognition and becoming full time employees were much higher. They had more say in shaping the project and were listened to more in discussions. Plaintiff was discriminated because of his color.

After reading the email from Plaintiff in which Plaintiff voiced his concern with the unfair treatment for Reckmeyer on 4/6/16, Carson did not reach to Mandizha to get the full picture of what was going on. Instead Carson contacted the aggressor, Reckmeyer, and together they created a false narrative as a basis for terminating Mandizha' contract. See BAC's EEOC position statement in Exhibit 11. Carson's actions were discriminatory and denied Plaintiff right to be heard and right to due process. He violated bank policy for conflict resolution.

Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation. Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, and other employment benefits.

5

### Evolving Reasons for Termination

20. On 4/6/16 Dimeo told Plaintiff that his contract had been terminated as a result of "something" he was alleged to have done in the afternoon.

21. At a 3:30 conference call on 4/11/16 with Teksystems, Plaintiff was informed that his contract was terminated because he was not "a good fit for the team."

22. Teksystems provided the following to NC Division of Employment Security as the reason for termination: "The claimant was separated from this job because the employer felt that he was not qualified." See exhibit 9.

23. Based on the position statement BAC sent to EEOC, the termination was due to "unsatisfactory performance". See exhibit 10.

Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation. Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, and other employment benefits.

## Count 2
## (Retaliation)

24. **Carson retaliated against Mandizha:** At 2:06 PM on 4/6/16 Mandizha sent an email (Exhibit 3) to Reckmeyer that he also copied to his manager Carson and Carson's manager Kris Krieger. In the email Plaintiff asked for useful information on how to avoid unfair treatment by Reckmeyer. Unaware to Plaintiff, Carson contacted Reckmeyer and the two fabricated a story that they used as justification for terminating Mandizha's contract. Carson instructed Dimeo to retrieve from Plaintiff a bank laptop used for work and office access card, and then walk Plaintiff out of the bank building. Carson also told Dimeo that he would not recommend Plaintiff for an architect role, but would recommend him for an engineer role. In terms of hierarchy engineer is below architect.

By failing to hear Plaintiff's side of the story or follow BAC conflict resolution policy or proper procedure for employee termination, Carson denied Plaintiff justice and fairness. He made his decision to terminate Mandizha's contract solely on the word from the aggressor Reckmeyer. Racial bias was at play. Carson denied Plaintiff right to due process and right to be heard in violation of company policy.

Carson's action against Mandizha who is black and had just been discriminated against by Reckmeyer was clearly retaliatory. It resulted in Plaintiff not being able to work. Plaintiff suffered loss of income and health insurance coverage. Being asked to surrender laptop and access card and then escorted out of the building as if he had created a very serious crime was both embarrassing and painful. Plaintiff suffered and continue to suffer severe emotional pain. Mandizha had sold his house at well below purchase price and relocated to Charlotte in time to start work on 1/4/16 as agreed in the contract. Plaintiff experienced the pain of being let down by Carson and Bank of America.

25. **Reckmeyer retaliated against Plaintiff:** Between 2PM and 4:30 PM on 4/6/16, Reckmeyer talked with Carson and lied about Plaintiff's character and behavior as a cover up on the way he had unfairly treated Plaintiff. See page 4 in Exhibit 10. Carson terminated Mandizha's contract based on a false narrative provided by Reckmeyer. Reckmeyer's actions were retaliatory. They resulted in Mandizha losing his job (source of income) and healthcare insurance.

26. **Dimeo retaliated against Plaintiff:** On 4/16/16, Dimeo acted on the word and instructions from Carson to take away laptop and access badge from Mandizha and walk him out of the building. He failed to do his due diligence and gather the facts first before taking action. Dimeo had met with Carson earlier in the day. He told Plaintiff that Carson had not raised the issue of terminating Plaintiff's contract. Dimeo spent the next few days trying to gather the facts about the contract termination See exhibit 8. It cost plaintiff his job, income and benefits.

27. **Tai retaliated against Mandizha:** Plaintiff emailed Senior Vice President Linda Tai (third level in management hierarchy) on 4/11/16 raising his concern his concern about the manner in which his laptop and access badge had been taken away from him and asking for help to ensure he was being treated with fairness and justice. See exhibit 14. According to the bank policy a person who becomes aware of a policy violation has an obligation to report it or to take appropriate action to address it. Linda Tai did not respond to Plaintiff's email request for help. She did not take any steps to protect Plaintiff. It cost plaintiff his job, income and benefits.

28. **Munro retaliated against Mandizha:** On 4/11/16 Plaintiff lodged a complaint with Teksystems employee relations manager Jennifer Munro about how Dimeo had failed to protect him from discriminatory and retaliatory treatments he had received at Bank of America. Teksystems policy provides for protection of consultants from unfair treatment by clients. Munro informed Mandizha on a phone conversation on 4/13/16 that there was nothing wrong with the way he had been treated. Through email on the same day, Mandizha requested from Munro for information on the appeal process. Munro replied *"Unfortunately we do not have an appeal process; your concern has been addressed and is now considered closed."*. See exhibit 16 for full copy of email exchange.

As a result, Plaintiff suffered loss of job, income and healthcare insurance. social and emotional pain.

29. **Youngstrom retaliated against Mandizha:** On 4/11/16 Plaintiff opened a discrimination and retaliation case with the BAC' ethics and compliance team and was assigned reference # 123 304 035. Nicole Youngstrom, an employee relations manager with the bank emailed Plaintiff on 4/14/16 advising him she would be investigating his case and that she wanted to speak with Teksystems. Youngstrom communicated with Munro (Teksystems) and completed her investigation without speaking with Plaintiff. Mandizha was advised verbally by Munro that Youngstrom had not found any wrong doing by Bank of America in the termination of his contract. Mandizha appealed against BAC's decision to uphold the contract termination and the manner in which Youngstrom had handled the investigation. The appeal case numbers are 2016517ITR092229 & 201661ITR065542. BAC did not respond to the appeals.

BAC continued to retain Youngstrom on the case. BAC purposely excluded from the position statement sent to EEOC, the highly biased investigative work that was done by Youngstrom. By failing to conduct free and fair investigation, Youngstrom cost the Plaintiff the opportunity to get justice and have his contract reinstated.

Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation. Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, and other employment benefits.

30. **BAC executive retaliated against Mandizha:** On 6/3016, Mandizha sent letters to the following Bank of America executives requesting their intervention and assistance with the unfair termination of his contract:

- Mr. Brian Moynihan – President & CEO
- Mrs. Sheri B. Bronstein - Global Human Resources Executive
- Mrs. Catherine P. Bessant - Chief Operations and Technology Office

See exhibit 11 for copy of the letter to CEO. The three executives did not intervene as requested to ensure Plaintiff was not being treated unfairly or to protect him against discrimination or retaliation in line with the bank policy. Instead the bank responded to Mandizha through a letter dated 7/12/16 (exhibit 15) advising him that the bank considered his case to be closed.

Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation. Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, and other employment benefits.

## Count 3
## (Continued Retaliation)

31. **Continued retaliation BAC:** In May 2015, Hanna Hosey, a recruiter with Modis contacted Plaintiff about a BAC job in Carson's team. But when she tried to submit Plaintiff's resume she was told that even though Mandizha was eligible to work for the bank, he was not welcome back in Carson's team.

On 7/19/16 Will Carter, a Modis recruiter contacted Plaintiff about a Solution Architect role with the BAC under a different manager. After checking with his co-worker, Will sent Plaintiff the following message: "Well I spoke to Hanna and I believe she said you were let go from that position. Not sure the details of it, but I don't think it's something we would be able to move forward with." See exhibit 6.

When third party recruiters that deal with Bank of America contact Plaintiff about new opportunities with or without the bank, they ask for the name of his former manager BAC. Since Carson is not giving good feedback to recruiters, Plaintiff's reputation in the industry has been tarnished. It is now very difficult for Mandizha to get employment again.

Plaintiff opened EEOC case against Bank of America on 8/8/16 and requested for EEOC mediation. However, BAC did not accept the invitation thereby missing the opportunity to hear Plaintiff's side of the story and ensuring justice was given to him quickly.

Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation. Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, and other employment benefits.

32. **Continued retaliation by Dimeo, O'Meara and Teksystems:** Teksystems continue to retaliate against Plaintiff by not helping him find another job as promised. See exhibit 7 on communication between Mandizha and Teksystems recruiter. Teksystems threatened, harassed and retaliated against Plaintiff for seeking justice from Bank of America through a letter from general counsel Ms. Megan O'Meara dated 7/15/16. See exhibit 13.

Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation. Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, and other employment benefits.

## Count 4
## (General Harassment)

33. On 3/7/16, Plaintiff's peer Bill Wilder requested a meeting with Plaintiff to discuss Plaintiff's progress on the project. See exhibit 16 for meeting request and subsequent email exchanges. Wilder sat in a cubicle behind Plaintiff and the two discussed their projects together often. So this request was rather unusual. Plaintiff walked to Wilder's desk and asked for clarification on the request. Wilder screamed at Plaintiff "You are an engineer, not an architect.". Plaintiff believes Bill's actions were due to racial bias and that by virtue of being white Wilder perceived himself to be at a higher level of status than Plaintiff.

34. **Warning Letters:** On Thursday 3/31/16, Meghan Higgins called Plaintiff to tell him about a written warning letter that Teksystems had received from Bank of America about Plaintiff's alleged unwillingness to be coached by others. Meghan indicated that Plaintiff's performance was otherwise great and there was nothing to worry about. It was the first time Plaintiff heard about the said warning. When asked why no one at the bank had talked to Plaintiff in the first place or why a verbal warning had not been issued first, Meghan admitted that she did not have enough information. She decided to schedule a meeting for Monday 4/4/16 to be attended by Teksystems' account manager Matthew, Dimeo, Meghan and Plaintiff.

On Monday 4/4/16 Meghan called rescheduled meeting to Thursday 4/7/16 to allow Dimeo to meet with Plaintiff's manager Carson first on Wednesday 4/6/16. Dimeo wanted to get more information from Carson before talking to Plaintiff. When Dimeo went to tell Mandizha about the contract termination on 4/6/16, he told Plaintiff that the issue of terminating his contract had not been discussed in the meeting that had been held earlier in the day between Carson and Dimeo.

Plaintiff was worried about the alleged warning letters and how the issue was being handled. Conversations about the warnings were taking place behind his back. HR was not involved. He was bothered by the fact his manager did not even talk to him about them.

35. **BRM:** On 3/2/16 Panayota Karras, the BRM Project Manager replied to Mandizha's email request for assistance with a project matter that project managers typically help with:

Charles,

As a courtesy, I sent this follow-up.

Please note that in the future, you are responsible for your own follow-ups. I would appreciate it if you would discontinue sending me IMs/e-mails assigning me your responsibilities be that follow-ups or scheduling meetings to complete internal SA deliverables from this day forward.

I am a PM not a personal assistant. I follow-up on my deliverables just as Krystl follows up on hers and Jared his, and so does everyone else on the team. If you need my attendance at your meetings for the SA work, feel free to include me as an attendee and please let me know the AIM so that I may decide if I need to attendee or just get an update from you as I have other assignments and another project to manage along with this one.

See exhibit 18 for complete email exchange

Karras choice of language was poor and offensive to Plaintiff and it was not consistent with bank policy.

## Count 5
## (Segregation and classification)

36. **Presentations:** Plaintiff was supposed to make a presentation of his project to IT management and clients. But he heard from his peer, Bill Wilder, that Robert Thornton would be doing Mandizha's presentation instead. Both Wilder and Thornton were white. Bill did his presentation as originally agreed on. But Thornton did the presentation for Plaintiff, denying the later exposure to management and clients. It showed preferential treatment of whites. See exhibit 17.

37. **Meetings:** Reckmeyer replaced plaintiff with Thornton on his weekly meetings with IT management and clients. Both Reckmeyer and Thornton were white. Plaintiff was denied opportunity for exposure to management and clients. Plaintiff was shielded away from management and clients.

## INJURY

38. A judgment granting equitable relief directing Defendant to cease and desist from exposing Plaintiff to discrimination and retaliation;

39. A judgment directing Defendant to reimburse and make Plaintiff whole for any and all earnings, including bonus payments, she would have received but for Defendant's discriminatory treatment and unlawful dismissal, including but not limited to, back pay, double back pay, and contractual damages.

40. A judgment awarding Plaintiff compensatory damages for mental anguish, loss of dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to be determined at trial, including reasonable attorneys' fees, as provided under applicable law.

41. A judgment awarding Plaintiff double back pay damages for Defendant's intentional retaliation of Plaintiff;

42. A judgment awarding Plaintiff front pay;

43. A judgment awarding Plaintiff double back pay;

44. A judgment awarding Plaintiff contract damages;

45. A judgment awarding Plaintiff punitive damages;

46. An award of prejudgment interest, costs and attorney's fees; and

47. Such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable by jury in this action.

DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty that he/she is the plaintiff in the above action, that he/she has read the above complaint and that the information contained therein is true and correct. 28 U.S.C. §1746; 18 U.S.C. §1621.

Executed at Charlotte on 5/12/2017.
(Location) (Date)

_____
Signature